## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FLEETWOOD SERVICES, LLC, ROBERT L. FLEETWOOD and PAMELA A. FLEETWOOD, individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>v.<br><br>COMPLETE BUSINESS SOLUTIONS GROUP, INC. d/b/a PAR FUNDING; THE JOHN AND JANE DOES<br><br>                       Defendants. | Civil Action No. 18-cv-00268 (JS)<br><br><br>JURY TRIAL DEMANDED<br><br><br>**SECOND AMENDED COMPLAINT** |

Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood, by and through their undersigned attorneys, individually and on behalf of all others similarly situated, file their Second Amended Complaint against Defendant Complete Business Solutions Group, Inc. d/b/a Par Funding, and the John and Jane Doe investors and allege as follows upon personal knowledge as to themselves and their own acts and experience, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.      This is a RICO action to save a small Texas business, and other similarly situated small businesses, from financial ruin at the hands of a scheme (the "Lending Enterprise") by the Defendants to originate, fund and collect on usurious and illegal loans.

2.      Defendants' scheme prey upon small, financially distressed businesses in Texas and throughout the United States, and fraudulently induces them into advances pursuant to so-

called future account receivable purchase agreements or merchant case advance agreements. (collectively, the "CBSG Agreements").

3.     The terms and conditions of these agreements are wholly inaccurate, and knowingly designed and/or used by the Defendants to deceive the small businesses and others into believing the agreements do not contemplate a loan transaction so that they do not trigger the usury laws of various states.

4.     When Plaintiffs and other similarly situated businesses cannot meet their obligations under these agreements, Defendants offer new advances under even more unconscionable terms.

5.     Eventually, the terms become too oppressive, small businesses default, and the Defendants aggressively pursue small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening, deceptive, and illegal collection tactics.

6.     In the end, Plaintiffs and other similarly situated businesses face certain financial ruin while Defendants recover not only the principal advanced, but also interest at rates that exceed 300%, which rate is far greater than any interest permitted by applicable law.

## INTRODUCTION

7.     Plaintiffs Fleetwood Services, Mr. Fleetwood and Mrs. Fleetwood were victimized by a predatory merchant cash advance lender and its respective broker, who intentionally and systematically took advantage of Plaintiff Fleetwood Services at a time when it was experiencing cash-flow issues.

8.     Plaintiffs are not alone.  Numerous other small businesses and citizens in Texas and across the nation have similarly been victimized by the same predatory lending scheme, as evidenced by the number of lawsuits filed by victims in California, Massachusetts, Michigan,

Mississippi, New York, and Pennsylvania, all claiming similar cash advance transactions were based upon false and misleading representations.

9.      Defendants' financing activities are not regulated by the government and the fees, penalties and rates are not subject to any regulatory oversight.

10.     Defendants use this lack of regulatory oversight to evade state usury laws by creating agreements that are wholly misleading, and intended to deceive courts around the country into believing the agreements do not constitute a loan transaction but, rather, the purchase of future receivables to which usury laws do not apply.  In reality, no receivables are assigned or transferred, the small businesses continue to collect the proceeds thereof and the amounts advanced are repaid through daily payments by the small businesses at annualize that in this case exceed 114% and, in other cases, may exceed 300%.

11.     As Bloomberg News has reported, the merchant cash advance industry in which the Defendants operate is "essentially payday lending for businesses.[1]  It's a high-risk market, and interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's." *Id.*

12.     The industry has increasingly come under national scrutiny for its devastating impact upon small businesses.  In June of 2017, Congressman Emanuel Cleaver, II launched an investigation of small business financial technology ("FinTech").

13.     Congressman Clever was "particularly interested in payday loans for small businesses, also known as 'merchant cash advance"[2] such as the one at issue in this litigation.

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] Scott M. Pearson, *House Member Launches FinTech Lending Investigation*, CONSUMER FINANCE MONITOR (June 26, 2017), https://www.consumerfinancemonitor.com/2017/06/26/house-member-launches-fintech-lending-investigation/.

14.     He expressed concern that "some FinTech lenders may be trapping small business owners in cycles of debt…"

15.     The National Consumer Law Center came to the same conclusion:

Merchant cash advances operate very similarly to payday loans and have similar problems.  A lump sum of cash is taken out as an advance on a borrower's future sales.  The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[3]

16.     As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[4]

17.     According to the Consumer Financial Protection Bureau, over 19 million U.S. households resort to payday loans.  Of that number, almost 70% of borrowers have to take out a second loan to cover the first, and 20% end up saddled with 10 or more loans, one after the other.

18.     The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[5]

19.     The New York Attorney General's Office has also acknowledged the damage these loans do, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that

---

[3] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf..

[4] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[5] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[6]

20.    Defendants are the commercial equivalent of payday lenders.

21.    Defendants' scheme is designed to trap the small business in a cycle of never ending debt so that Defendants can reap as much profit as quickly as possible. When small businesses cannot make the daily payments required by their agreements, they offer small businesses new advances under more onerous terms. Ultimately, small businesses cannot keep up with the daily payments required under these agreements, and upon default, Defendants aggressively pursue their full recourse rights against the small businesses and their owners who frequently personally guarantee repayment of the advances.

22.    As one small business protection advocate has put it, Defendants are "in the business of helping [small] businesses fail." *Bloomberg, supra.*

## THE PARTIES

23.    Plaintiff Fleetwood Services, LLC ("Fleetwood") is a Texas limited liability company with its principal office in Dallas, Dallas County, Texas.

24.    Plaintiff Robert L. Fleetwood ("Mr. Fleetwood") is a natural person residing in Dallas, Dallas County, Texas.

25.    Plaintiff Pamela A. Fleetwood ("Mrs. Fleetwood") is a natural person residing in Dallas, Dallas County, Texas.

26.    Upon information and belief, Defendant Complete Business Solutions Group, Inc. d/b/a Par Funding ("CBSG") is a corporation organized and existing under the laws of

---

[6] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

Pennsylvania, with a principal place of business located at 141 N. 2nd St., Philadelphia, Pennsylvania, 19106.

27.     On information and belief, each of the John and Jane Doe Defendants (the "Investors Defendants") are investors in CBSG and each are citizens of New York, New Jersey, and Pennsylvania.

## JURISDICTION AND VENUE

28.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims, individually, and on behalf of similarly situated persons, for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961– 68. The Court has subject-matter jurisdiction over the state-law claims of the Plaintiffs' and putative Class Members because they are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

29.     Additionally, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

31.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of Pennsylvania, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

32.     Plaintiff Fleetwood is a small business, providing golf course construction, development, renovation and remodeling.  It is owned and operated by Plaintiffs Robert Fleetwood and Pamela Fleetwood.

33.     Pamela Fleetwood has no financial experience and her highest level of education is a high school diploma.

34.     Robert Fleetwood has an associate's degree in general studies, and is by trade a construction worker.

35.     Defendant CBSG is a lender in the merchant cash advance industry, tempting its customers with promises of immediate working cash.

36.     Like many small construction businesses, Fleetwood does not immediately get paid for its services.  Generally speaking, it provides the service to its customers and invoices the customers on 30-60 date terms.  Thus, there is a delay between the time Fleetwood generates a receivable and gets paid which, at times, can cause cash flow issues for the company.

37.     As a result, like many thousands of other small business victims, Fleetwood was induced into a never-ending series of merchant cash advance agreements, whereby Fleetwood was forced to take out new MCA agreements just to pay off the prior MCA agreements in what would eventually become a never-ending cycle of debt.

38.     Defendants' entire scheme preys upon and targets unsophisticated small businesses, like Fleetwood, that are caught in an unsustainable cycle of debt.

39.     In preying upon these small business victims, Defendants fraudulently induce their victims into entering into a new MCA loan with Defendants at even more onerous interest

rates by falsely promising that their loan product will consolidate all of their existing MCA debt and lower the interest and payments that they were previously paying.

40.     Plaintiffs are one of these victims.

41.     By January 2017, Plaintiffs were drowning in MCA debt, and Defendants knew it.

42.     In total, Plaintiffs had at least six other MCA agreements that required onerous daily payments that Plaintiffs could not afford to pay.

43.     Enter Defendants.

44.     Preying upon Plaintiffs' desperate financial condition, Defendants approached Plaintiffs through a broker, Prime Time Funding, in or around January 2017.

45.     Defendants promised to consolidate and lower Plaintiffs' existing payments and lower the interest that Plaintiffs were previously paying under their existing MCA agreements.

46.     As part of these promises, Defendants presented Plaintiffs with a take-it-or leave-it contract of adhesion, which falsely represented that Defendants were purchasing Fleetwood's future receivables.

47.     The contract presented to Plaintiffs was a complete and utter sham designed to evade the criminal usury laws of Texas, and to fraudulently conceal the illegal nature of the transaction at issue.

48.     The unlawful contract of adhesion was also riddled with unfair and oppressive provisions designed to shield Defendants from its criminal conduct.

49.     Among these unfair and oppressive provisions, Defendants included

> ➤ A Pennsylvania choice-of-law provision, which was designed to evade the criminal usury laws of Plaintiffs' home state;

> ➤ A Pennsylvania venue provision requiring Plaintiffs to litigate hundreds of miles away from their home state;

-8-

> ➢ An attorneys' fees provision awarding Defendants and Defendants only 10% of the funded amount in the event of a breach;

> ➢ A warrant of attorney permitting Defendants to confess judgment against Plaintiffs;

> ➢ A jury trial waiver;

> ➢ A limitation of damages provision;

> ➢ A personal guarantee;

> ➢ A power of attorney;

> ➢ A UCC lien on all of their assets;

> ➢ A requirement to purchase business interruption insurance;

> ➢ A provision prohibiting Plaintiffs from taking out other loans or financing with any other party; and

> ➢ A class action waiver.

50.     None of the above provisions was negotiated.  Rather, the provisions were take-it-or-leave-it provisions unilaterally dictated by Defendants.

51.     On or about January 4, 2017, Fleetwood capitulated to the unconscionable demands of Defendants and signed the contract of adhesion now at issue (the "Agreement").

52.     The Agreement purported to be a sale of Fleetwood's future receivables.  It was not.

53.     The Transaction provided as follows:

| Purchase Amount | Purchase Price | ACH Payments | Other Fees | "Specified Percentage" | Undisclosed APR |
|---|---|---|---|---|---|
| $370,000 | $547,600 | $5,000.25 x 110 | $995.00 | 25% | 114.07% |

54.     Terms of the Agreement included, but were not limited to:

a.     In exchange for providing a total of $370,000.00, Fleetwood became obligated to repay $547,600.00 by way of 110 payments of $5,000.25, with payment in full estimated to be made by June 12, 2017;

b.      Full recourse protection for Defendant CBSG in event of default or bankruptcy. Fleetwood was required to execute a security agreement; Plaintiffs Mr. Fleetwood and Mrs. Fleetwood were required to execute personal guarantees as well as confessions of judgment as a condition of the transaction, thereby permitting Defendant CBSG to immediately seize Fleetwood's business assets as well as the personal assets of Plaintiffs Mr. Fleetwood and Mrs. Fleetwood and to obtain a Judgment by Confession without even notifying them;

c.      Plaintiff Fleetwood was required to turn over all its user names, passwords and bank account information. Any attempt by Fleetwood to change either the user name or password without advising Defendant CBSG was defined as an event of default;

d.      Failure by Fleetwood to make the daily fixed payment was defined as an event of default, even if Plaintiff Fleetwood Services had no receivables that day;

e.      A purported 25% was identified as the specified percentage of receivables at issue, which had nothing to do with the terms of repayment other than to appear as though that was the percentage of interest being charged for the loan; and,

f.      Substantial fees could be assessed by Defendant CBSG for, including but not limited to, insufficient funds ($75.00 each up to four times before default declared), rejected ACH attempts ($100.00), change of bank accounts ($50.00), default fee ($5,000), and collection expenses in event of default.

55.     The purported fair market value of Fleetwood's future receivables was unilaterally dictated by Defendant CBSG, and was based upon the credit worthiness of Fleetwood. In contrast, a true factoring agreement determines the fair market value of the receivable, based on the credit worthiness of the customer who is expected to pay the receivable.

56.     Here, Defendant CBSG's fixed daily debits have nothing to do with any calculation of Fleetwood's receivables. Rather, any and all receivables from any customer in any amount based on any sale is subject to transfer to Defendant CBSG for payment of the daily fixed debit.

57.     Pursuant to the terms of the Agreement, as opposed to a true factoring arrangement, Plaintiffs Mr. Fleetwood and Mrs. Fleetwood bear the entire risk of a customer not paying, rather than CBSG.

-10-

58.     In reality, the true purpose of the Agreement was to protect the financial interests of CBSG, while increasing Fleetwood's dependence on future loans, because the debt consolidation program offered by CBSG was designed to fail.

59.     In furtherance of their fraudulent and deceptive scheme, Defendants fraudulently and/or negligently induced Fleetwood to enter into the purported debt consolidation program by making knowingly false and misleading representations such as that "the purpose of the [CBSG] consolidation funding program is for [Fleetwood] to move away from cash advance companies."

60.     CBSG repeatedly represented that the consolidation funding would alleviate daily cash flow concerns by reducing Fleetwood's daily ACH debits from $6,667.00 per business day to $5,000.25, a savings represented to be of approximately $1,666.75 each business day.

61.     In an effort to intentionally mislead and/or negligently make Fleetwood believe that its cash flow would improve, CBSG represented that it would be wiring in a set amount of cash infusion over an initial nine (9) weeks of the loan, so that those funds could be used to make Fleetwood's payments to other lenders.  However, by the time CBSG took the 33rd ACH from Fleetwood's bank account, all of the upfront cash infusion that was used to induce Fleetwood into the debt consolidation program was used up. As a result, Fleetwood was left paying thousands of dollars more to CBSG than it had been paying prior to the debt consolidation program offered.

62.     The Broker and CBSG conspired to make these knowingly false, misleading and/or negligent representations in an intentional attempt to lead Fleetwood to believe that this consolidation program would improve its cash flow, when in actuality, it was purposefully and/or negligently designed to worsen Fleetwood's cash flow, and thereby increasing its dependence on further loans exclusively from Defendant CBSG.  In fact, another hidden term of

the Agreement conveniently limited Fleetwood to seeking any further business loans exclusively from Defendant CBSG.

63.     The cash flow benefit touted by CBSG not only quickly evaporated over the life of the loan, but resulted in a longer loan term and the payment of additional interest.   As expected and/or negligently designed, the daily payments under the debt consolidation program forced Fleetwood to either come up with its own additional capital or borrow even more money from CBSG.  Coincidentally, it was about that time that Fleetwood became financially strained from the existing relationship with CBSG, that it was offered an opportunity by CBSG to refinance its remaining balance, at a reduced daily rate, but for an extended additional period of time.

64.     During the course of the Agreement, there were days when there were insufficient funds to cover the daily ACH debit taken by CBSG.  On a number of occasions, threats were made by a representative at CBSG that unless payments in full were made, a default would be declared.  Further, Plaintiffs Mr. and Mrs. Fleetwood were warned that if default was declared they would lose the business, their house, and all their personal assets.  These threats caused tremendous emotional and mental distress to Plaintiffs Mr. Fleetwood and Mrs. Fleetwood since everything they owned was at risk of seizure and/or foreclosure.

65.     Moreover, in direct conflict with the reconciliation provision of the contract, CBSG charged Fleetwood over $11,000 in admitted "Finance Charges" in exchange for lowing the daily payment amount:

| | | | |
|---|---|---|---|
| 03/16/17 | $ 5,000.25 | $ 312,588.25 | Payment |
| 03/17/17 | $ 3,250.00 | $ 309,338.25 | Payment |
| 03/17/17 | $ (7,001.00) | $ 316,339.25 | Finance Fee |

| 04/28/17 | $ 5,000.25 | $ 209,712.25 | Payment |
| 05/01/17 | $ 3,000.00 | $ 206,712.25 | Payment |
| 05/01/17 | $ (4,000.00) | $ 210,712.25 | Finance Fee |

66.     That is absolutely not how a factoring agreement works, but it is exactly how a loan works.  Even more troubling, CBSG charged Fleetwood this "Finance Fee" even though there is absolutely no right to charge a "Finance Fee" anywhere in the agreement.

67.     After being trapped in CBSG's tentacles without the ability to put an end to the debt consolidation scheme, Fleetwood finally qualified for a Small Business Loan with a traditional lender.  On July 5, 2017, Fleetwood was able to pay-off Defendant CBSG in full. Nevertheless, Fleetwood continues to receive calls from brokers and lenders seeking to tempt Fleetwood with additional merchant cash advances.

### I.     The Agreement is not an account purchase transaction, but rather, it is a disguised loan.

#### a.    There was no "sale" of receivables.

68.     Pursuant to the Agreement, CBSG advanced $370,000 (the "Purchase Price") to Fleetwood in exchange for the repayment of $547,600 (the "Purchase Amount") by way of 110 daily ACH withdrawals (each, the "Daily Specified Amount") from a designated Fleetwood account (the "Account").

69.     While the Agreement used terms such as "factoring agreement," "sale," and "purchase," the Transaction had none of the hallmarks of a true sale and all of the hallmarks of the loan that charged a usurious interest rate of more than 114%.

-13-

70.     The quintessential element of any sale is the absolute transfer of the benefits and burdens of the ownership of the subject asset from the seller to the buyer. That did not occur here for several reasons.

71.     First, notwithstanding the fact that the Transaction was denominated a "sale" of Fleetwood's future receipts, CBSG acquired only a temporary interest in Fleetwood's receivables.

72.     Second, CBSG's temporary interest did not divest Fleetwood of the most important benefit of ownership – the right to use the proceeds of the Receipts. Pursuant to the Agreement, Fleetwood was only obligated to deposit a specific amount of its receivable collections into the Account so that CBSG could withdraw the Daily Specified Amount.

73.     Accordingly, by the express terms of the Agreement, Fleetwood retained the right to use the proceeds of the very assets CBSG was allegedly purchasing. In fact, Fleetwood was *required* to use such proceeds to operate its business, because the Agreement prohibited Fleetwood from obtaining any other additional financing.

74.     Third, Fleetwood's repayment obligations were not limited to delivery of the purchased Receipts or even some percentage thereof. CBSG purportedly purchased Fleetwood's future Receipts, but the Agreement reflects that CBSG plainly did not want to wait to be repaid until such receipts were generated and collected. Pursuant to the Agreement, although CBSG purchased Fleetwood's future Receipts, Fleetwood was required to pay the Purchased Amount by remitting an amount of all its receipts.

75.     In other words, rather than getting paid from what it allegedly purchased, CBSG required Fleetwood to repay the Purchased Amount through independent funds – an obligation that is inconsistent with a true sale.

76.     Finally, by operation of the Agreement's default rights and remedies, repayment of the Purchased Amount was put beyond any risk of non-payment and Fleetwood remained absolutely liable for repayment of the Purchased Amount.

77.     Under the Agreement, if an Event of Default occurred, Plaintiffs immediately became liable for the full outstanding Purchased Amount, together with additional fees and costs due under the Agreement, and CBSG had the right and power, among other things, to confess judgment against the Plaintiffs for this amount.

78.     An Event of Default is defined under the Agreement so that a default would occur under any and every conceivable circumstance wherein Fleetwood failed to generate or collect future Receipts to repay CBSG including, if Fleetwood: (i) failed to timely make the Daily Payments; (ii) became insolvent or filed for bankruptcy, (iii) transferred or otherwise sold its assets or (iv) moved, terminated, interrupted or suspended its business in any way.

79.     Accordingly, even if Fleetwood's business were destroyed or suspended by a hurricane, flood, fire or other Act of God, it would in default of the Agreement and, pursuant to the remedies provided by the agreement, Plaintiffs would be liable for the full outstanding balance of Receipts Purchased Amount, plus all fees and costs due under the Agreement.

### b. The "Daily Specified Amount" is a disguised, fixed, loan payment

80.     According to the Agreement, the "Daily Specified Amount" was allegedly based on a good-faith estimate of Fleetwood's daily future receipts, however, that could not have been possible because Fleetwood's business did not generate daily receipts, it invoiced its customers on terms. In reality, the Daily Specified Amount is a knowingly false term unilaterally dictated by CBSG in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Fleetwood's daily receivables.

81.     Fleetwood was required to pay the "Daily Specified Amount" until CBSG received the "Purchased Amount" in full.

### c.  The Purchased Amount is the disguised repayment of principal and interest

82.     The purported Purchase Amount of the Future Receipts is also complete fiction. In the Agreement, Defendant CBSG represents that the "Purchased Amount" is tied to the value of the purchased receivables.  In reality, however, the alleged fair market value was unilaterally dictated by CBSG based on the creditworthiness of the merchant.  In contrast, true factoring agreements determine the fair market value of the receivable based on the credit worthiness of the customer expected to pay the receivable.

83.     Furthermore, the Agreement is not tied to specific and existing contracts for goods already delivered by the merchant to a customer.  In other words, the right to repayment is not tied to the value or money owed to CBSG based on goods or services already provided to a customer who has not yet paid, but instead is based on any and all future receivables based on the sale of goods or services by Fleetwood until the "factoring agreement" was paid in full. By definition, these terms do not constitute a factoring agreement, but rather a loan.

### d.  Agreements provided for full recourse in the event of a default or bankruptcy.

84.     Unlike a true factoring agreement, the terms of the Agreement provided for absolute payment for the Plaintiffs.

85.     If the Fleetwoods were ever to miss a payment, they would be in default and CBSG would be entitled to confess judgment against the Plaintiffs.

86.     The Agreements allowed for up to four nonsufficient fund fees of $75 before default would occur.

-16-

87.     In order to obtain the loans, Fleetwood was required to grant to CBSG "a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory … now or hereafter owned or acquired by SELLER/MERCHANT and (b) all proceeds, as that term is defined in Article 9 of the UCC . . . ."

88.     The security agreement further provided that, upon default, Defendant CBSG "may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration of otherwise."

89.     Mr. and Mrs. Fleetwood were also required to personally guarantee performance of the representations, warranties and covenants under the Agreements.

90.     Further, should Plaintiffs ever enter bankruptcy, the Agreements provided "Protections 2 [confession of judgment] and 3[enforcement of security interest in collateral] are immediately invoked."

### e.  CBSG's conduct demonstrates the Agreement was intended to be a loan.

91.     CBSG's conduct demonstrates that the CBSG Agreements, including the Agreement with Fleetwood, are intended to be loans.

92.     On December 20, 2018, Bloomberg News published an article exposing the unlawful collection tactics employed by CBSG when a merchant fails to pay:[7]

---

[7] https://www.bloomberg.com/graphics/2018-confessions-of-judgment-visit-from-gino/



Gino Gioe enters the Los Angeles office of Radiant Images on Feb. 15, 2018, captured by a surveillance camera. SOURCE: COMPLAINT FILED IN U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

93.     As Bloomberg News revealed, CBSG routinely employs mob-like intimidation

tactics when a merchant cannot pay:

> Gioe's travels around the U.S. show how the regulatory vacuum is
> enabling intimidation tactics that seem like relics of a lawless past.
>
> Ten of Gioe's unannounced visits to borrowers, from Chicago to
> small-town Alabama, were described in court papers and
> interviews with Bloomberg News. He made "threats of violence
> and physical harm" to employees of a California rehab center,
> according to one court complaint. A tire-shop owner near Boston
> said in another court filing he "felt that physical harm would come
> to me and my family" when Gioe walked into his shop in 2016
> demanding immediate payment.
>
> A third borrower, recounting Gioe's visit to his Maryland trucking
> company last year, described him in an affidavit as resembling "an
> aging but still formidable character ripped from the World
> Wrestling Federation" who had been sent not to negotiate but to
> "intimidate me into making a lump-sum payment."[8]

94.     In the Bloomberg article, both "Gino" and the principal owner of CBSG, Joseph

LaForte, admitted to Bloomberg News that its merchants are "borrowers" and that CBSG is a

---

[8] *Id.*

"lender." *See id.* ("Gioe said the former owner had borrowed $1 million from Par with no intention of paying it back…"), ("Joseph LaForte says his brother is an outside broker for Par who sometimes helps him collect debts but isn't an employee. He says Par had a right to pursue Sharma for reneging on millions of dollars of debt."), ("Joseph LaForte says that even though Gioe was helping borrowers, a few did complain about getting a visit.").

95.     The Bloomberg article further goes on to detail numerous examples where CBSG is treating its agreements as absolutely repayable loans and not true sales. As described by Bloomberg News, "Gioe's visits followed a pattern. He would show up unannounced, demand to speak to the owner and say he wasn't leaving until he got paid, according to the people who described the visits in court records and interviews. All of the people say Gioe seemed to be trying to intimidate them. Four say they called the police, though no charges were filed." *Id.*

96.     In fact, CBSG treats its merchant transactions as so absolutely repayable, that not even a bankruptcy court can stop their collection tactics. *See id.* ("Gioe could be persistent. When he showed up at a beauty-supply warehouse in Chicago last year, its new owner, George Souri, told him a bankruptcy judge had ordered creditors to back off. 'We don't deal with courts, we have our own ways to collect,' Gioe responded, according to an affidavit Souri filed in the bankruptcy case. When Souri forbade him from speaking to the warehouse's former proprietor, Gioe remarked, 'We'll go to her house and deal with her there,' the affidavit states.").

97.     If the CBSG Agreements reflected true account purchase transactions, "Gino" would be paying visits to the companies who owed the receivables allegedly purchased and CBSG would not be employing Mafioso-style intimidation tactics against *the seller*.

-19-

## CLASS ALLEGATIONS

98.     Plaintiffs and the putative Class Members repeat and re-allege the allegations of

each of the foregoing paragraphs as if fully alleged herein.

99.     Plaintiffs bring this action pursuant to Fed. R. Civ. Pr. 23(b)(2) and 23(b)(3).

100.    Plaintiff Fleetwood brings this action individually and on behalf of a class of

similarly situated persons defined as follows:

> **Merchant Class:**     All citizens of Texas who, on or after
> January 22, 2015, paid money to a member of the Lending
> Enterprise pursuant to a CBSG Agreement with an effective
> interest rate exceeding twenty-eight percent.

> **Merchant Class:**     All citizens of Texas who, on or after
> January 22, 2015, paid money to a member of the Lending
> Enterprise pursuant to a CBSG Agreement with an effective
> interest rate exceeding fifty-six percent.

101.    Plaintiffs Mr. and Mrs. Fleetwood bring this action individually and on behalf of a

class of similarly situated persons defined as follows:

> **Principal Class:**     All citizens of Texas who, on or after
> January 22, 2015, paid money to a member of the Lending
> Enterprise pursuant to a CBSG Agreement with an effective
> interest rate exceeding twenty-eight percent.

> **Principal Class:**     All citizens of Texas who, on or after
> January 22, 2015, paid money to a member of the Lending
> Enterprise pursuant to a CBSG Agreement with an effective
> interest rate exceeding fifty-six percent.

102.    The following people are excluded from the Classes: (1) any Judge or Magistrate

presiding over this action and members of their families; (2) Defendants, Defendants'

subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their

parents have a controlling interest and its current or former employees, officers, and directors;

(3) persons who properly execute and file a timely request for exclusion from the Classes; (4)

persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waiver; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

103.   **Numerosity**: The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder is impracticable.  Based on publically available documents, each of the Classes likely numbers are in the hundreds or more.

104.   **Commonality and Predominance.**  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Classes.  Common questions for the Classes include, without limitation, the following;

a)      Whether the CBSG Agreements are loans or account purchase transactions under Tex. Fin. Code § 306.001(1);

b)      Whether or to what extent Tex. Fin. Code 306.103(b) is applicable to the CBSG Agreements;

b)      Whether the CBSG Agreements are usurious under Tex. Fin. Code §305.001(a);

c)      Whether the Plaintiffs may recover moneys paid to the Lending Enterprise pursuant to the CBSG Agreements;

d)      Whether the CBSG Agreements violate Tex. Bus. & Comm. Code 17.44(a);

105.   **Typically:**  Plaintiffs' claims are typical of the claims of the other members of the Classes.  Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

106.   **Adequate Representation:**  Plaintiffs have and will continue to fairly and adequately represents the interests of the Classes, and have retained counsel competent and

-21-

experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

107. **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

<u>**FIRST CAUSE OF ACTION**</u>
**Texas Usury Statute**
**(CBSG)**

108. Plaintiffs individually and on behalf of the Class Members, repeat and incorporate the allegations forth above.

109. Tex. Fin. Code §305.001(a-1) and §305.003 each provide that a creditor who contracts for, charges, or receives interest greater than the legal maximum is liable to the

obligor for an amount that is equal to three times the difference between the maximum allowable legal interest and the total amount of interest charged.

110.    The maximum interest rate allowed under Tex. Fin. Code §303.009(c) is 28%.

111.    The CBSG Agreements with Fleetwood, and the Putative Class Members, each charged interest that was twice the maximum 28% permitted by Texas law.

112.    Fleetwood and the Putative Class Members did in fact pay interest to CBSG in excess of 28%.

113.    With respect to Fleetwood, the most that the Agreement between CBSG and Fleetwood could have been charged in interest under Texas law is $23,379.93.

114.    The interest rate of the Agreement between Fleetwood and CBSG was at least 110%.

115.    The Agreement charged $177,600 in interest, which is a difference of $154,220.07.

116.    Accordingly, Fleetwood is entitled to statutory damages in the amount of $462,660.21 under Tex. Fin. Code §305.001(a).

117.    In addition, Tex. Fin. Code § 305.004(a) provides that:  "*In addition to the amount determined under Section 305.003*, a creditor who charges and receives legal interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for:

(1)    the principal amount on which the interest is charged and received; and

(2)    the interest and all other amounts charged and received.

118.    The CBCG agreements with Fleetwood and the Putative Class Members charged interest in excess of fifty-six percent.

-23-

119.    Accordingly, Fleetwood and the Putative Class Members are entitled to a return of all principal and interest charged by CBSG.

120.    With respect to Fleetwood alone, in addition to the $462,660.21 required under Tex. Fin. Code §305.001(a), Fleetwood is also entitled to $558,700 in total principal, fees and interest charged by Defendants.

121.    By reason of the foregoing violations, Plaintiffs are entitled to recover against CBSG an amount to be determined at trial but, in any event, not less than $1,021,360 and the putative Class Members are similarly entitled to recover three times the amount of improperly charged and collect interest plus all principal, fees and interest charged by CBSG under their respective CBSG Agreements.

## SECOND CAUSE OF ACTION
### Attorney's Fees
### (CBSG)

122.    Plaintiffs, individually and on behalf of the Class Members, repeat and incorporate the allegations forth above.

123.    Plaintiffs have incurred, and will in the future continue to incur reasonable attorney fees as a result of Defendants violations of Tex. Fin. Code §§ 305.001 and 305.003.

124.    Pursuant to Tex. Fin. Code. §305.005, "[a] creditor who is liable under Section 305.001 or 305.003 is also liable to the obligor for reasonable attorney's fees set by the court."

125.    By reason of the foregoing, Plaintiffs and the Putative Class Members are entitled to recover from CBSG reasonable attorneys' fees incurred and to be incurred in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Fraud
### (CBSG)

126.     Plaintiffs, individually and on behalf of the Class Members, repeat and incorporate the allegations forth above.

127.     CBSG intentionally misrepresented the true nature of the transactions to the Plaintiffs and Putative Class Members in order to avoid application of Texas usury laws.

128.     CBSG knowingly misrepresented that the disguised loans were enforceable when they were illegal under law by, *inter alia*, e-mailing Plaintiffs and Class Members copies of the CBSG Agreements, requesting that Plaintiffs and the Class Members execute one or more of the CBSG Agreements and requesting that Plaintiffs and Class Members authorize CBSG to make daily withdrawals of the Daily Specific Amount from the bank accounts, all of which created the false impression that the CBSG Agreements are legally enforceable and that Plaintiffs and Class Members were and/or are obligated to repay when they were not.

129.     CBSG obtained Plaintiffs and the Class Members' written authorization to collect on the CBSG Agreements via daily ACH withdrawals from the designated bank account and CBSG collected upon these illegal contracts via ACH withdrawals from the designated bank account, which created the false impression that the CBSG Agreements are legally enforceable and that Plaintiffs and the Class Members were and/or are obligated to repay when they were not.

130.     These false impressions were material, and Plaintiffs did not reasonably know that the contracts were illegal.  In fact, Plaintiffs only became aware of their illegality when informed by counsel.

-25-

131.    In addition, CBSG falsely represented the market value of the future receivables that CBSG purported to purchase in each of the CBSG Agreements. This stated value was not based on any true market value assessment, but rather was a knowingly false representation unilaterally made by Defendants in order to disguise the true nature of the Transactions.

132.    Further, CBSG falsely represented that it would only require repayment if Plaintiffs and/or the Class Members paid the future receipts they were purportedly purchasing under the CBSG Agreements when, in fact, CBSG required repayment even before the allegedly purchased receipts were generated and collected.

133.    CBSG's misrepresentations were intended to induce reliance because if Plaintiffs and the Class Members were aware that (1) the Agreements were illegal and (2) the market value of the receipts were incorrect, and/or (3) the repayment obligations were misrepresented, the Plaintiffs and Class Members would not have executed the CBSG Agreements and entered into the transactions with CBSG.

134.    CBSG knew that the representations were false at the time they were made.

135.    CBSG made these representations with the intent to deceive Plaintiffs and the Putative Class Members, and with the intent to avoid the criminal usury laws.

136.    Plaintiffs and the Putative Class Members reasonably relied upon these knowingly false representations to their detriment, as they executed the CBSG Agreements and were forced to pay interest in excess of Texas' criminal usury threshold.

137.    Plaintiffs and the Putative Class Members were directly and proximately damaged by CBSG's knowingly false representations by paying interest and principal on criminally usurious loans for which they had no legal obligation to repay.

-26-

**FOURTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(c)**
**(CBSG)**

138.    Plaintiffs, individually and on behalf of the Class Members, repeat and incorporate the allegations set forth above.

**A.    Culpable Persons**

139.    CBSG is a limited liability company capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

**B.    The Association-in-Fact Enterprise**

140.    The Investor Defendants, CBSG and various brokers (the "Brokers") are separate individuals or entities associated with each other by shared personal and/or one or more contracts or agreements for the purpose of originating, underwriting, servicing and collecting usurious loans to the Plaintiffs and countless other small businesses throughout the United States.

141.    This association of the Investor Defendants, CBSG, and the Brokers constitute a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. § 1962(c), as the term is defined in 18 U.S.C. § 1961(4).

142.    The Lending Enterprise has an existence separate and apart from the illegal activity in which it engages by entering into legal financing agreements and attempting to collect lawful debts using legal collection practices.

**C.    The distinct roles in the Enterprise.**

143.    Each of the Lending Enterprise Members has a distinct role in the Lending Enterprise.

144.    The Investor Defendants provide capital for investment by the Lending Enterprise in lawful and unlawful loans, including the Agreements.

145.    The Brokers soliciting borrowers, including the Plaintiffs, obtaining necessary underwriting information for use by CBSG in underwriting the lawful and unlawful loans and assisting the collection of the lawful and unlawful loans by obtaining the borrowers authorization to effect daily ACH withdrawals from specified bank accounts.

146.    CBSG underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements and exercises managerial authority over the Lending Enterprise.

**D.      Engagement in Interstate Commerce**

147.    The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

148.    Specifically, the members of the Lending Enterprise maintain offices in Pennsylvania and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Lending Enterprise to borrowers in Texas and throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically through an automated clearing house.

149.    In the present case, all communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Specific Amount via electronic interstate withdrawals processed through an automated clearing house.

-28-

**E.     Conducting Affairs through a Pattern of Racketeering.**

150.    CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud) in violation of 18 U.S.C. 1962(c).

151.    Beginning no later than September 1, 2014 and continuing today, CBSG devised and carried out a scheme to conduct the affairs of the Lending Enterprise to intentionally defraud borrowers in Texas and throughout the United States, including the Plaintiffs and Class Members, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay and to intentionally defraud others into satisfying such loan obligations when a borrower defaulted.

152.    Since CBSG and the Brokers are each web-based companies that conduct virtually all of their business through the internet, email communications, telephone calls, and wire transfers, it was reasonably foreseeable that interstate emails, telephone calls, and wire transfers would be used in furtherance of the scheme, and, in fact, intestate emails, telephone calls and wire transfers are used in furtherance of the scheme.

153.    Specifically, CBSG directed, approved or ratified, the Broker's use of the internet, interstate email, telephone calls, and other communications to intentionally defraud borrowers in Texas and throughout the United States, including the Plaintiffs and Class Members, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay.

154.    As part of this scheme, by the use of interstate emails and telephone calls, the Brokers target and solicit cash-strapped businesses upon which to pawn of usurious loans funded by CBSG. These interstate emails and telephone calls intentionally create the false impression that the usurious loans are legally enforceable by:

(i) misrepresenting the true nature of the loan transactions as receivable sales in order to avoid applicable criminal usury laws;

(ii) falsely representing that disguised loan contracts are enforceable when they are illegal under Texas or other applicable law;

(iii) falsely claiming that the contracts are governed under the laws of Pennsylvania when CBSG and its affiliates know strong public policy considerations dictate that Texas or other state's laws would govern construction of the contracts;

(iv) advising the illegal loans would be funded through interstate wire transfers; and

(v) directing all loan repayments to be made by electronic interstate bank withdrawals via an automated clearing house.

155.    Once the loans are approved by CBSG, CBSG furthers the scheme by using interstate wires to fund the unlawful loans and electronic interstate bank withdrawals to repay the amounts advanced under the disguised loans, all of which further create the impression that the usurious loans are legally enforceable contracts which CBSG knows to be false.

156.    If a borrower defaults, CBSG uses interstate e-mails and telephone calls to once again fraudulently induce the borrowers to obtain new advances under loans funded by CBSG that CBSG knows misrepresent the true nature of the transaction in an effort to evade applicable usury laws and create the false impression that the contracts are legally enforceable when they are not thereby inducing the borrowers to enter into and make payments on new usurious agreements to pay off the obligations under the old ones.

157.    Upon information and belief, borrowers in Texas and throughout the United States, like the Plaintiffs and Class Members, reasonably rely upon these knowingly false representations in order to enter into and make payments on criminally usurious loans.

158.    In the present case, through a series of interstate e-mails in January 2017, the Broker solicited Plaintiffs, provided Plaintiffs with a copy of the loan application, processed the

-30-

loan application, and, upon approval by CBSG, provided Plaintiffs with a copy of the Agreement dated January 4, 2017 which the Broker asked that Plaintiffs execute, together with a form authorizing CBSG to electronically withdrawal the daily payments from Fleetwood's Bank Account. The Broker's actions were intentionally designed to and, in fact did, create the impression that the January 4, 2017 Agreement was a legally enforceable contract which Defendants knew to be false.

159.    CBSG furthered the scheme against Plaintiffs by funding the January 2017 loan through an interstate wire transfer and thereafter withdrawing the Daily Specific Amount due under the Agreement by electronic interstate withdrawals processed through an automated clearing house, all of which was intentionally designed by CBSG to and, in fact did, create the impression that the Agreement was legally enforceable contract which CBSG knew to be false.

160.    CBSG's scheme continued long after January 2017. When Plaintiffs and/or the Putative Class Members had difficulty making the daily payments under the CBSG Agreements, CBSG or the Brokers, used similar emails and wire communications to intentionally create the false impression that each successive disguised loan was a legally enforceable contract in order to induce the Plaintiffs to enter into and make payments on the criminally usurious loans.

161.    Plaintiffs and the Putative Class Members reasonably relied upon these knowingly false representations to their detriment, as they executed each of the Agreements and were forced to pay interest in excess of Texas's criminal usury threshold.

162.    CBSG's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343 which is a "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Lending Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**F.     Conducting Affairs Through the Collection of an Unlawful Debt**

163.    The CBSG Agreements between Plaintiffs, the Putative Class Members, and CBSG constitute unlawful debt within the meaning of 18 U.S.C. 1962(c) because (1) they violate applicable criminal usury statutes, and (2) the rates are more than twice the legal rate.

164.    CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of this unlawful debt in violation of 18 U.S.C. 1962(c).

165.    Specifically, CBSG directed, approved or ratified, the obtainment by the Borker or others of Plaintiffs' authorization to electronically withdrawal payments on an unlawful debt from designated bank accounts.

166.    Upon receipt of such authorization, CBSG did, in fact, make the daily withdrawals required by the Agreements.

**G.     Injury**

167.    As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs and the Putative Class Members have suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs and the Putative Class Members were forced to pay usurious amounts of interest and have lost, and will continue to lose, customers, profits, goodwill and business value.

**FIFTH CAUSE OF ACTION**
**Conspiracy under 18 U.S.C. § 1962(A)**

**(All Defendants)**

168.    Plaintiffs, individually and on behalf of the Class Members, repeat and incorporate the allegations forth above.

169.   Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

170.   By and through each of the Defendants' business relationships with one another, their close coordinate with one another in the affairs of the Lending Enterprise, and frequent emails communications among the Defendants concerning the underwriting, funding, servicing and collection of unlawful loans, including the Agreement and other CBSG Agreements, each Defendant knew the nature of the Lending Enterprise and each Defendant knew that the Lending Enterprise extended beyond each Defendant's limited role.   Moreover, though the same connections and coordination, each Defendants combined to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means.   Defendants acted maliciously, without legal justification, and with the intent of injuring Plaintiffs.   As such, Defendants have engaged in a civil conspiracy.   In the course of their civil conspiracy, Defendants committed one or more unlawful, overt acts.   Such unlawful, overt acts include Defendants' conduct described above.   Such actions by Defendants subject such Defendants to joint and several liability.

171.   Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Lending Enterprise's affairs in order to collect upon unlawful debts, including the CBSG Agreements, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in the Lending Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

-33-

172.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

173.    Plaintiffs and the Putative Class Members have been and will continue to be injured in their business and property by reason of the Defendants violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.   The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, tens of thousands of dollars in improperly collected loan payments; attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' criminal activities.

174.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Putative Class Members are entitled to treble damages, plus costs and attorneys' fees from the Defendants.   The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt, including the Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood and the Putative Class Members respectfully request that this Court enter an order:

a)   Certifying the proposed Classes;

b)   Appointing Plaintiffs as Class Representatives for the respective classes;

c)   Appointing Plaintiffs' attorneys below at Benesch, Friedlander, Coplan & Aronoff, LLP as Class Counsel for the classes and subclasses;

d)   Requiring CBSG to pay Plaintiffs and each Class Member three times (3x) the difference between the maximum allowable legal interest and the total amount of interest charged and collected on their respective CBSG Agreements;

-34-

e) Requiring CBSG to pay Plaintiffs and each Class Member all principal, interest, costs and fees collected under their respective CBSG Agreements;

f) Awarding Plaintiffs and the Class Members treble damages pursuant to RICO;

g) Requiring CBSG to pay Plaintiffs and the Class Members reasonable attorneys' fees and costs; and

h) Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims that may be so tried.

Dated: October 29, 2019

BY: _____

Shane R. Heskin
WHITE & WILLIAMS, LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103
(215) 864-6329
heskins@whiteandwilliams.com
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
David S. Almeida
333 West Wacker Drive, Suite 1900
Chicago, IL 60606-2211
Ph: 312.212.4954
Cell: 312.576.3024
Fax: 312.757.9192
Email: dalmeida@beneschlaw.com
www.beneschlaw.com

*Attorneys for Plaintiffs Fleetwood Services, LLC, Robert L. Fleetwood and Pamela A. Fleetwood, and putative class members.*

-35-

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Second Amended Complaint has been served via first class mail and via e-mail upon counsel of record, on this 29th day of October, 2019.

Shane R. Heskin, Esq.